The undersigned have reviewed the Award based upon the record of the proceedings before the deputy commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence as a whole, the undersigned reach the same facts and conclusions as those reached by the deputy commissioner, with some minor technical modifications. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
Accordingly, the Full Commission find as fact and conclude as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and at the initial hearing as
 STIPULATIONS
1. Plaintiff's date of injury is October 20, 1995.
2. On that date, the parties were subject to, and bound by, the provisions of the North Carolina Workers' Compensation Act.
3. On that date, an employer/employee relationship existed between plaintiff and defendant employer.
4. St. Paul Fire Marine Insurance Company (hereinafter "defendant-carrier") was the carrier on the risk.
5. Plaintiff's average weekly wage is to be determined.
***********
Based upon the stipulations of the parties, which include Industrial Commission Form 19, Industrial Commission Form 60, Industrial Commission Form 24 (withdrawn), Industrial Commission 28B, Industrial Commission Form 33, Industrial Commission Form 33R, Order of Removal filed August 20, 1996, Compromise Settlement Agreement approved September 5, 1996, Order of Withdrawal of Counsel for Defendants filed February 4, 1997; and based further upon the competent, credible evidence adduced at the initial hearing, the undersigned make the following additional
 FINDINGS OF FACT
1. Plaintiff, who has a high school education, was a 34-year old male at the time of the hearing before the Deputy Commissioner. He had been employed with defendant-employer nine months on October 20, 1995. On that date, plaintiff suffered an injury by accident when he jumped from a roller that he thought was going to turn over. When plaintiff landed on the ground, he fractured his right tibia.
2. Immediately following the accident, plaintiff was seen at Wake Medical Center. On October 26, 1995, plaintiff underwent an open reduction and internal fixation of the right tibial plateau fracture and application of Hybrid external fixation with allograft in the right proximal tibia. Douglas Dirschl, M.D., was plaintiff's treating physician.
3. On January 1, 1996, plaintiff underwent a second operation whereby the external fixator was removed, and Dr. Dirschl examined plaintiff's right tibia. Plaintiff's leg was found to be entirely stable and excellently healed. Plaintiff underwent extensive physical therapy.
4. Plaintiff was released from treatment by Dr. Dirschl in June of 1996. Dr. Dirschl gave plaintiff a forty percent permanent partial impairment rating of the right leg. Plaintiff was also placed under permanent work restrictions including no lifting greater than thirty pounds; no standing longer than thirty minutes at a time or an aggregate total of four hours per working day; no climbing, stooping or crawling; no squatting; and no carrying objects greater than ten pounds.
5. On October 24, 1995, plaintiff's case was referred to Debbie Rogers at Resource Opportunities, Inc. to coordinate plaintiff's medical care. Following plaintiff's release from Dr. Dirschl, Ms. Rogers began coordinating return-to-work efforts for plaintiff as well.
6. After receiving work restrictions from Dr. Dirschl, Ms. Rogers observed the jobs of roller and paver at defendant-employer. Following the recommendations of Dr. Dirschl, modifications to the job requirements were made. Dr. Dirschl then approved these jobs for plaintiff in July of 1996.
7. Once the jobs were approved by Dr. Dirschl, Ms. Rogers submitted the job descriptions and Dr. Dirschl's letter approving the jobs to Jerry Evans, Risk and Safety Manager for defendant employer.
8. In July of 1996, plaintiff was offered the two jobs approved by Dr. Dirschl. In response to this offer, plaintiff expressed concern regarding the pain in his knee but, ultimately, revealed that he did not want to return to work with defendant employer.
9. At defendant-carrier, plaintiff's claim was handled by Brenda Hammond. Ms. Hammond first contacted plaintiff on November 2, 1995. During that conversation, Ms. Hammond reviewed plaintiff's average weekly wage with him. The Form 19 indicated that plaintiff's hourly wage was $9.10 and that his average weekly wage was $364. Plaintiff informed Ms. Hammond that he actually worked fifty hours per week rather than forty. Ms. Hammond modified the Form 19 to show plaintiff's average weekly wage as $500.50, which was based on $9.10 per hour for forty hours, and time and a half, or $13.65 per hour, for the remaining ten hours plaintiff worked per week. At the end of the conversation, Ms. Hammond described the workers' compensation process to plaintiff.
10. Ms. Hammond then prepared a Form 60 which was filed with the Commission on November 13, 1995. The Form 60 contains a typographical error whereby plaintiff's average weekly wage is shown as $550.50 as opposed to $500.50. However, the compensation rate of $333.68 is correct, based on the average weekly wage of $500.50 stated on the Form 19. Defendant carrier continued to pay plaintiff temporary total disability benefits at $333.68 per week and, at times, paid plaintiff early, at this request.
11. In July of 1996, Ms. Hammond was notified by Mr. Evans that plaintiff had refused defendant-employer's job offer. Ms. Hammond contacted plaintiff and advised him that she would file a Form 24 to terminate his benefits due to his refusal of defendant-employer's job offer. Ms. Hammond also offered plaintiff $30,000.00 to settle his case or, alternatively, a Form 26 for payment of permanency benefits. Plaintiff informed Ms. Hammond that he had an attorney, Hank Patterson. Ms. Hammond asked plaintiff to have Mr. Patterson contact her and initiated no further contact with plaintiff.
12. In August of 1996, plaintiff called Ms. Hammond and accepted the $30,000.00 settlement offer. Ms. Hammond described the settlement agreement as a full and final settlement. Plaintiff understood that a portion of the settlement was for his knee and the remainder was to "sign away" his rights.
13. Ms. Hammond sent the file to attorney Jack Holmes, then with Maupin, Taylor, Ellis Adams, to draft the settlement agreement. Ms. Hammond continued paying temporary total disability benefits to plaintiff until two days after the agreement was approved. At plaintiff's request, Ms. Hammond also arranged for a $5,000.00 advance to be paid to plaintiff upon his signing of the settlement agreement.
14. On August 12, 1996, plaintiff went to Mr. Holmes' office to sign the agreement. Included with the agreement was an employment waiver that plaintiff was asked to sign. Plaintiff asked Mr. Holmes a question about the waiver and expressed a reluctance to sign it. Mr. Holmes told plaintiff that he did not have to sign the waiver, and plaintiff thereupon signed only the settlement agreement. Plaintiff asked no questions regarding the settlement agreement itself.
15. Mr. Holmes submitted the signed agreement to the Industrial Commission through the mail. Special Deputy Commissioner Ronnie Rowell, who at the time was a North Carolina Industrial Commission Agency Legal Specialist, received the package. Mr. Rowell reviewed the settlement agreement along with all other file materials which included the Form 19, the Form 60, the Form 24 with supporting documents, and the medical records. At the time that Mr. Rowell reviewed the Industrial Commission file, the rehabilitation reports generated during Ms. Rogers' handling of plaintiff's claim were not included in the file. A review of the rehabilitation reports by Special Deputy Commissioner Rowell after the Industrial Commission's approval of the settlement agreement established that the reports merely confirmed the information documented in plaintiff's medical records. Mr. Rowell testified that the information contained in the reports would not have affected his decision to approve the settlement agreement. Further, although Mr. Rowell testified hat he would not have approved the agreement had he known it contained an error on its face, that being an incorrect average weekly wages figure, the evidence tends to show that his statement is based merely upon the existence of an error, and not upon any unfairness resulting from the error.
16. After reviewing all of the relevant documentation, Special Deputy Commissioner Rowell contacted Mr. Holmes to discuss his concerns regarding the agreement. Following the conversation, Mr. Holmes contacted Ms. Hammond to determine whether a Form 26 had been discussed with plaintiff as opposed to a final settlement agreement. Ms. Hammond told Mr. Holmes that a Form 26 agreement had been discussed with plaintiff, and Mr. Holmes communicated that fact to Special Deputy Commissioner Rowell.
17. At the suggestion of Mr. Holmes, Special Deputy Commissioner Rowell then contacted plaintiff and discussed his concerns, particularly his concerns regarding future surgery and complications. During that conversation Mr. Rowell asked plaintiff whether he had talked about his claim with anyone else. Plaintiff told Mr. Rowell that he had spoken with a workers' compensation attorney, Hank Patterson. Therefore, although plaintiff was not represented by counsel, he had sought the advice of a leading expert and plaintiff's counsel in the field of workers' compensation law prior to entering into the settlement agreement. Mr. Rowell then discussed plaintiff's rights with him, including the workers' compensation process and his rights to further compensation, further medical treatment, a hearing, and other options. Plaintiff stated that he understood his rights and the process. Plaintiff told Mr. Rowell that he wanted the agreement approved. Being satisfied with his inquiries, Special Deputy Commissioner Rowell approved the agreement.
18. Approximately three months after the agreement was approved by the Industrial Commission, plaintiff retained counsel and filed a Form 33 asking that the agreement be set aside. Plaintiff, through counsel, also requested a Form 22 from defendant-employer which established an average weekly wage of $402.06 (resulting in a compensation rate of $268.05), a figure far below the $500.50 upon which compensation benefits had been calculated and paid.
19. The North Carolina Industrial Commission had the authority to approve the compromise settlement agreement. There is no competent, credible or convincing evidence in the record that the agreement was improperly before the Industrial Commission.
20. The Industrial Commission approved the voluntary settlement agreement only after a full investigation and determination that the agreement was fair given the plaintiff's understanding of the settlement, plaintiff's desire to have it approved, and the uncertain nature of plaintiff's condition for both parties. The rehabilitation reports submitted after the agreement was approved contained no additional or different information that would have caused the Commission not to approve the agreement.
21. The unambiguous language of N.C. Gen. Stat. § 97-17
prohibits all parties to any agreement for compensation, when approved by the Commission, to deny the truth of all matters therein set forth unless it is made to appear to the satisfaction of the Commission that there has been error due to fraud, misrepresentation, undue influence or mutual mistake. There is no competent, credible or convincing evidence in this record that there was any fraud, misrepresentation, undue influence or mutual mistake at the time the agreement was entered into by the parties.
***********
The foregoing stipulations and findings of fact engender the following:
 CONCLUSIONS OF LAW
1. On October 20, 1995, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant employer. N.C. Gen. Stat. § 97-2(6).
2. As a result of plaintiff's injury by accident, defendants filed a Form 60 pursuant to which plaintiff received temporary total disability compensation for all periods of time that he was totally disabled as a result of the work injury.
3. After plaintiff reached maximum medical improvement, the parties entered into a voluntary settlement agreement pursuant to which plaintiff received $30,000. The agreement was approved by the North Carolina Industrial Commission on September 5, 1996. The agreement was properly before the Industrial Commission, and the Commission had the authority to approve the agreement.
4. The North Carolina Industrial Commission approved the agreement only after a full investigation and determination that the agreement was fair in light of the uncertainty for both parties as to plaintiff's future condition. The investigation included a telephone call with plaintiff during which other options were discussed with him. Plaintiff understood his rights and asked that the agreement be approved. Thus the Commission properly found the agreement to be fair in light of all considerations. Vernon v. Steven L. Mabe Buildings,336 N.C. 425, 444 S.E.2d 191 (1994).
5. Plaintiff's average weekly wage on October 20, 1995 was $402.06. The error in the calculation of an average weekly wage of $500.50 was to plaintiff's benefit. Such error was a mistake of law, not of fact. N.C. Gen. Stat. § 97-2(5); § 97-17.
6. Plaintiff's request that the compromise settlement agreement approved by the Commission on September 5, 1996 be set aside, pursuant to G.S. § 97-17 of the North Carolina Workers' Compensation Act, must be denied, because the competent, credible and convincing evidence of record fails to support his contention that the agreement was entered into due to fraud, misrepresentation, undue influence or mutual mistake. Pruittv. Publishing Co., 289 N.C. 254, 221 S.E.2d 355 (1975).
7. Plaintiff relies upon the Vernon case to assert that the Commission is required to evaluate a settlement agreement on "fairness" grounds and that the agreement can be set aside if it is later found not to be fair. Vernon,336 N.C. 425, 444 S.E.2d 191 (1994). The undersigned acknowledges the Commission's duty to evaluate the fairness of a settlement agreement, and it should be noted that the Commission did make a fairness determination in the case at hand. However, theVernon case dealt with a Form 26 Agreement, while the case at hand involves a Compromise Agreement for Final Settlement and Release. Id. The considerations involved in evaluating a Form 26 agreement for fairness as opposed to a compromise settlement (clincher) agreement are obviously different. The clincher agreement involves the payment of an up-front dollar amount of consideration to the plaintiff in order to obtain the waiver to any further amounts he may have later been due. There is some amount of risk by both parties, as plaintiff may never have ended up entitled to the amount of consideration which would have been equal to the amount of consideration paid up front. On the other hand, plaintiff may have ultimately been entitled to more. The Commission took all of this into consideration, as well as the understanding of the plaintiff and his wishes in determining that the agreement was ultimately fair. The Commission, accordingly, properly approved the agreement. Pruitt, 289 N.C. 254, 221 S.E.2d 355 (1975).
***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the undersigned enter the following
 AWARD
1. Plaintiff's motion to set aside the previous settlement of this claim is HEREBY DENIED.
2. Each side shall pay its own costs.
IT IS FURTHER ORDERED that this case be removed from the Full Commission hearing docket.
This the ___ day of ____________, 1999.
 S/_____________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/_____________ DIANNE C. SELLERS COMMISSIONER
DISSENTING:
S/_____________ THOMAS J. BOLCH COMMISSIONER
JHB:kws